This case on the docket, 2-18-0504 Attorney General of Edison Company, Petitioner of Commerce v. Illinois Commerce Commission, et al. Respondent of the League Parting on behalf of the Petitioner of Commerce, Mr. Matthew E. Price Parting on behalf of the Respondent of the League, Illinois Commerce Commission Mr. James E. Levy Parting on behalf of the Respondent of the League, Environmental Law and Policy Center Thank you, Mr. Price. You may proceed. Good morning, Your Honor. May it please the Court? A bedrock rule of interpreting statutes is that when the General Assembly defines a term, that definition must be given effect. And the Commission here violated that rule. The term electric utility is defined in the statute to exclude municipal utilities and rule electric cooperatives. But the Commission ignored that and decided to read the term, quote, more colloquially, end quote, in order to include entities that the General Assembly wished to exclude. And in so doing, the Commission overstepped its authority and this Court should reverse. I thought it would be helpful to begin just by placing the three programs at issue in this case in a broader context. These three programs, the Adjustable Block Program, the Community Renewable Generation Program, and the Solar for All Program, are part of a much larger renewable procurement effort that the statute discusses. One point to make about these is that only electric utilities are subject to the procurement requirements of the statute. They're the only entities that actually procure renewable energy credits or RECs under this program and under the IPA's administration. And the three programs at issue here, the statute says there needs to be a million, at least a million RECs procured through these three programs. And to put that in perspective, the target in the statute overall is 14.5 percent of the load, the amount of usage, which works out to 14.7 million RECs. So these three programs are a relatively small subset of an overall much larger procurement. And as for larger procurement, we agree and everyone agrees that you can be, a project can be located in a municipal utility or rural electric cooperative territory and participate with respect to the larger program. But when it comes to the three smaller programs at issue here, the General Assembly had different objectives and it made clear, as the plain statutory text says, and I'll get to that in a moment, that with respect to these programs, it was concerned with ensuring that only projects located in electric utility service territories can qualify. With the three programs and the statutes you're citing, correct me if I'm wrong, I mean two of them, the one with the Adjustable Block Program and the one with the Community Renewable Generation Program, actually use the word electric utility. And that's defined by the statute, correct? That is correct. Right. But the Solar for All Program, the statute you cite, and again, correct me if I'm wrong, only uses the word utility, not electric utility. Correct? Well, that's not correct. So if you look at Section 1-56B-3, it uses the term electric utility in, this is Appendix A-2-12, so you can follow along. Find the statute right here. Okay. It uses the term electric utility in the last sentence of that B-3. The agency shall retire any renewable energy credits purchased from this program and the credits shall count for the obligation under Subsection C of Section 1-75 of this Act for the electric utility to which the project is interconnected. So the same term is used in that statute as well. But I'd like to respond to I think what is the sort of the broader point raised by Your Honor's question. The Commission's theory is really that utility and electric utility may mean different things in the context of these statutes. And its attempt to generate some kind of ambiguity in what I think is a very plain statutory text comes from that kind of wordplay. Throughout the statute, electric utility and utility are used interchangeably. And my colleagues don't dispute that throughout the statute that is true. And I think the best example for that is Section 1-75C, C-1B, which sets forth the targets for procurement. And this is at page A-223. And you'll see that there are percentage targets that are set out for the number of racks that have to be procured each year. And this is what the statute says, at least 13 percent of each utility's load, at least 14.5 percent of each utility's load. So the statute is using in setting up the entire program the term utility because the General Assembly understood that that term is shorthand for the term electric utility. And that is true throughout the statute. Because only electric utilities have to purchase these racks. Exactly. That's exactly right. And so the notion that in these particular subparagraphs, utility now means something different and broader than it does everywhere else in the statute, respectfully, I think that is completely contrary to the manifest purpose of the General Assembly and the plain text of the statute. And it is not enough to generate an ambiguity. So if they're using utility, it can mean electric utility, but it can't mean municipal utility. That's right. The way the General Assembly used the term utility throughout the entire statute, including in the very subsection that we're talking about here, makes plain that when it used the word utility, it meant electric utility. And the context makes that completely clear. And so the idea that they meant something slightly broader than that or somewhat broader than that in one subparagraph of the same subsection just is contrary to the basic principle that when the General Assembly uses a word, that word should mean the same thing throughout the statute. And, of course, the opposing house is going to point out that the statute calls for the use of these devices, the distributed renewable energy generation devices, community renewable generation devices, and the definition of those are devices that can be hooked up to local utilities, correct? That is correct. Those definitions do say that. But their position rests on the fallacy that just because the General Assembly used those definitions here, it meant to allow any, any project falling within those definitions to qualify for these programs. That's not what the statute says. Let's talk about that. What is the overarching goal of the legislation? Isn't there something in it to benefit the entire state, statewide benefit? It is to benefit the entire state. That's right, Your Honor. How does that play into your argument? Okay. Sure. Well, I'd make a couple of points about that. First of all, the environmental benefits of allowing these devices and encouraging these devices and subsidizing them benefits the entire state no matter where they're located. That's the first point. The second point I'd make is that what the General Assembly was doing with these specific subprograms was trying to bring renewable generation to parts of the state that previously hadn't seen much growth in renewable generation because, for example, in populated areas, land is more expensive, populations are denser, and there isn't the space to put in a large wind farm or a large solar farm as there are in rural areas. And so we see, for example, in the Solar for All program, they're very concerned about bringing these projects to low-income communities, which historically hadn't had much renewable generation development. So when the statute says we want to bring the benefits to the entire state, we understand that to mean they want to bring the benefits of renewable generation to parts of the state that historically hadn't seen much renewable development. And the other point I'd make about this is that those general statements of purpose are by and large talking about the entire statute. And, of course, as I started out, these programs are only a small part of the entire statute, and the programs located in municipal areas and rural electric cooperative areas can participate in the broader procurement, just not in these subprograms. I did want to get back to just finishing my response to Justice Burke's question about these two definitions, because I think if you look at these definitions and then compare them to the statutory text concerning these programs, it is crystal clear that we are right, that the General Assembly did not want any community renewable generation project or distributed renewable energy generation device to participate, but instead selected only a subset of those definitions. And that is crystal clear because those definitions also include wind and biomass and crop and all sorts of different technologies, but these programs are limited to solar. And they don't dispute that. So their entire position rests on the false premise that just because these definitions are used, that means that the entire definition is imported into these programs, when the face of the statute makes abundantly clear that that is just not true. You say makes it abundantly clear, but if the legislature really wanted to place geographic limitations on where these programs could operate, they certainly know a better way of doing it than using the word electric utility and utility and being vague about it. Well, I would say that the legislature didn't think of these as geographic limitations as much as kind of technical limitations. The way these programs work is they're hooked into the distribution system, and so they generate some energy that offsets the energy that people otherwise... Right, where they're interconnected. I mean, that's the issue is where they're interconnected. That's right, and they're offsetting the energy that people would otherwise be buying from the electric utility. And so the General Assembly understood that these programs were intended to serve that role, and because people are receiving essentially credits offsetting the amount of electricity they're putting back onto the distribution system, it made sense to the General Assembly to say, well, you've got to be connected to the electric utility system that you're buying your energy from, and that's what it did in the statute. So I don't think of it as geographic limits as much as limits about which entity is the one who you're connected with because you're selling energy into that entity's distribution system and getting credit for it in addition to selling the rest. So if you have a low-income community that happens to have its own local utility supplying electric, they're out of luck for this solar for all, which is designed to provide solar to local communities. Well... I'm sorry, low-income. Well, that community has made the choice by the municipal utility to exempt itself from the entire regulatory structure here. It's not required to buy Rex and all. And I think part of the issue here is that the electric utility customers are the ones that are funding these programs. They're the ones paying the money to subsidize these kind of generators, and it makes sense and it's intuitive that the General Assembly would have wanted the low-income communities that are funding these programs in the first place to be the ones that benefit from the jobs and economic development that Renewable Generation would bring. Unless their purpose, again, was to benefit the overall state. Let me ask you this. If we find the terms electric utility and utility are not deployed with precision, then they sort of become ambiguous, right, in interpreting the statute? Well, I think there needs to be a genuine ambiguity, and I would say electric utility is a defined term and is in no way ambiguous. I mean, it's very, very clearly defined. And so the only question is whether you can somehow parse these statutes to read utility in these particular subparagraphs as meaning something other than electric utility when the term utility means electric utility everywhere else in the same subsection. And that is the linguistic difficulty that the other side simply can't overcome in this case. Under the case law, do we owe any deference to the commission's interpretation or alleged expertise in these matters? Well, you owe deference to the commission's interpretation of a statute if the statute is ambiguous, but you're not required to defer to a commission interpretation of a statute that is contrary to the text of the statute or is not reasonable, and that's the case here. We're just saying plain language should control. The plain language of the statute should control. And that's true, by the way, even if there might be a legislative history or legislative purpose that's in tension with the plain language. But the case is very clear that the plain language is the best indicator of what the legislature intended with respect to these particular provisions. Are we to take anything from the fact that out of all the parties that were involved in this rape case from the initiation that ComEd is the only party that's taking this position, including the other two electric utilities are not taking this position? Well, the other electric utilities aren't in this Court. That's true, Your Honor. But I don't think I would draw anything from it. That's my question. But I think the statute is very clear, and, you know, ComEd cares about making sure the customers that are paying for these things get the economic benefits of having them in their communities. Are there customers paying for this that are out of the State? That are not in the State? Yes. No. The only customers who are paying for these programs are the customers of the electric utilities. But they're generation devices that are out of State. With respect to the larger program, that's right. There can be generation devices in adjacent States, but not with respect to the three subprograms that we're talking about in this case. If the Court has no further questions about the statutes, I'm happy to walk through them. But if the Court has no further questions, I'm happy to wait for rebuttal and answer any further questions you may have. Okay. Thank you, counsel. Thank you. We'll have time for rebuttal argument. Mr. Wiegand, you may proceed. Good morning, Your Honors. My name is James E. Wiegand, Special Assistant Attorney General, representing the Respondent of the Illinois Commerce Commission. I'm joined by Mr. Brad McCoyne, an attorney for the Joint Respondent's Environmental Law and Policy Center, Natural Resource Defense Council, and Solar Business Coalition. The present case concerns the construction of the Future Energy Jobs Act, or FEJA, given by the Illinois Power Agency through its Long-Term Renewable Resources Procurement Plan and by the Commission through its review and approval of the agency's plan. The Illinois Power Agency, the agency with long experience in dealing with the creation of long-term renewable resources, and the Illinois Commerce Commission, the expert body over the regulation of the electric industry in Illinois, are in agreement on the construction of the provisions of FEJA related to the creation of long-term renewable energy resources. Both agencies found that the letter of FEJA on the intent of the General Assembly included the participation of entities other than the three public utilities for whom the agency obtains electricity in the establishment of new or community-based long-term renewable energy resources. As the court pointed out, Congress is the only one of the many interested parties who seek to remove municipal utilities and electric co-ops from participation in the three new small-scale programs under the plan. Why is the Commission correct? The Commission found that the plain language of FEJA showed that a community renewable generation project, as defined, or an appropriate distributed renewable energy generation device when interconnected to the distribution system of a rural electric co-op or municipal utility, is eligible to participate in these three small-scale programs. Are combat customers paying for these credits that are generated by a facility that only operates in a local utility area as part of the renewable portfolio standards? Well, the customers of the three utilities are paying for these credits because FEJA separated the, it used to be that we were buying the electricity from the thing. Now the actual generation of electricity is separate. They're buying the credits for creating a renewable resource. So then why should people who aren't paying for it receive the benefit? Because the General Assembly chose that the three utilities, this is how they got their money. They're not buying the electricity. They're buying these credits, renewable credits, whether or not the credit's generated within their service territory or outside their service territory. The subsection I of section 175 of the Illinois Power Agency Act shows that C1, any new generation, renewable generation project within the state of Illinois, there's nothing stated in the service territories of the utilities. Similarly, for the community-based project, nothing's said about only electric customers of the three utilities. So if the vast majority of these generation devices were, let's say, downstate or in the middle of the state, ComEd would still be paying for the credits to keep those going. Right. It's not in their area. Right. Yes, that's true. That's how it was designed. I mean, ComEd showed and attached to their, well, they cited to it in their original brief something where the two municipal utility projects had been approved and that if you looked at the paper, it showed that ComEd got 70% of the racks and Mid-America got four and Illinois got the 20-some RECs because the credits are being bought by them. But it has nothing to do with electricity. It's for the establishment of renewable energy resources within the state of Illinois. Let me ask you this. Your opponent has argued that the Public Utilities Act, the RPA Act and the Public Utilities Act thoroughly define electric utilities. They define public utility. And he seems to be saying that the legislature expressed its intent to exclude municipal utilities and rural electric cooperatives by using the terms electric utility or utility in the statute. So how do you respond to his statutory interpretation? Well, yes, in the Utility Act, electric utility, public utility and electric co-op are defined specially. In the Illinois Power Agency Act, municipal utility is specially defined. They have four special definitions the General Assembly created and then in the middle of the statute all of a sudden they're just talking about utility without an adjective. And on matters that they defined as including distribution systems of co-ops and municipal utilities as well as the electric utilities. And I think that was a deliberate attempt by the General Assembly to address this issue. It could have done that. We keep combating the definitions in the Illinois Power Agency Act. The two definitions include these distribution systems of municipal utilities and electric co-ops. Why include them if you're excluding them? The definition of the community projects actually only applies to these small-scale projects. It doesn't have any application outside of them. This is a new definition and these are new programs that they're tied to. For the General Assembly to say, we're including these in. Oh, no, we're not. We're excluding them by some, it makes no sense. Well, some of the places they use the word utility, it clearly applies to the electric utilities because they're the only ones that are under this requirement to provide these recs. Well, but it comes up in the terms of where the device or the project is interconnected. It will say things like the contracting utility gets the recs as soon as the device is interconnected to a utility and then talks about the... Sometimes it says interconnected to an electric utility. Well, that's true in the Illinois Solar for All Program, but in that program, the statute also explicitly states that the Illinois Power Agency will receive recs. And why would you say that if all the recs are only going to the three electric utilities? Because you wouldn't have to have the Illinois Power Agency get recs themselves. They would go directly then to the utilities like they do on the other two programs. Are you acknowledging these terms are ambiguous because they're in conflict? You sort of alluded to testably they're not used interchangeably. Are they ambiguous? Well, my problem is my client said this is clearly not ambiguous and obviously they were included. However, to the extent the court finds that this whole thing is somewhat ambiguous given the different terms, then my argument to the court is that then there should be deference to the commission and to a certain extent to the Illinois Power Agency's construction of the statute that they normally should be controlling. The construction here allows the utilities to continue to get their recs. There's no savings in money if the co-ops and the municipal utilities are excluded because they'll be still spending the same amount of money to obtain the recs whether or not the other two are included or excluded. There's no effect there on the actual expenditure of money by the consumers paying for this. There are some. I mean, this community renewable generation program requires certain metering and billing requirements that only apply to electric utilities. But under the IPA plan, if a co-op or municipal utility volunteer to go under either of those programs, they have to set up the equivalent metering provisions so that that will work. Is there any real enforcement for that since they're not under the jurisdiction? Well, I mean, the plan was set up because since it's a requirement of the statute, if they are voluntarily going under the statute, they should do the same thing as an electric utility does. And it may, again, keep people from participating in the plan. The commission and interpretation of the statute is reasonable, and I think it should be affirmed by the commission or it should be affirmed by this court. Thank you, sir. Mr. Klein, you may proceed. Thank you. Good morning. Brad Kahn on behalf of the Public Interest and Solar Industry Intervenors. The court should affirm the commission's order for the following three reasons. First, the Commerce Commission correctly interpreted the statute as a whole, consistent with the legislature's intent to benefit all citizens of the state. Second, this case, involving a 500-plus page technical statute and two expert agencies, is exactly the kind of case where agency deference is most appropriate. And third, the practical impact of ComEd's argument would leave large areas of the state without access to the programs, which is in direct violation of the legislature's intent to expand access throughout the state to benefit all citizens of Illinois. And I just want to start with a little bit of context here to the exchange earlier about how this renewable energy law actually works, and it's important to keep in mind we've had a Renewable Portfolio Standard, or RPS, in Illinois since 2007. And the structure of how this law works is, and it gets to the word, the usage of the word electric utility and utility. It is correct that under the RPS, going back since 2007, only the investor-owned electric utilities purchase the renewable energy credits. But that is entirely separate and apart from the location of where the project development can occur. And the legislature has specific legislative language about locations, and I think it was to your point, wouldn't it have been easier to just specifically identify geographic limitations on RECs? Yes, it would have, and in fact, that's exactly what the legislature actually did. And if you look at Section 175C1I, and that's at ComEd's appendix A228, that language lays out explicit geographic limitations. It says, in order to further the legislative purposes of the Act, renewable energy credits shall be eligible to be counted if they're generated from facilities located in the state. Very explicit language. Similarly, they knew how to exclude projects from counting. If you look one section down, 175C1J, they explicitly restrict renewable energy credits from projects sourced from a rate-based utility project. And they were specifically going after projects such as projects in Iowa that were rate-based by the investor and utilities there. So they knew how to do this, and they spoke very clearly. Likewise, in the definition of distributed generation project and community renewable project, the legislature spoke very clearly. It includes these projects. And that's consistent with how the RPS has worked since 2007. So I think we have to avoid getting confused about usage of the word electric utility and utility throughout the Act. We can see in many cases those words do mean the investor and utility, but it's talking about the REC procurement mechanics. How about the municipal utility? Correct. Are you saying that? Customers of municipal utilities and customers of rural electric co-ops are the law only applies to the investor and utilities. So the procurement of the credits does not occur from municipal utilities or rural electric co-ops. But, again, that is separate and apart from where the projects are located. And there are good reasons for that. Number one, the manifest legislative purposes of the Act, intending to spread the benefits, increase access to all citizens of the state, throughout the state. In our brief, we excerpt multiple instances of that explicit legislative intent. And secondly, the broader you can source these projects, as long as those benefits of the projects continue to accrue to Illinois citizens, they wanted to make sure Illinois citizens benefit, but the broader your geographic landscape, the more competition you get, the more labor costs might be in certain areas. The better the reduced REC costs, so it brings down the cost of this program for everybody. So, in fact, it does benefit customers of ComEd and those that are regulated by the state to have as broad as possible competition and access. And it furthers the legislative intent of the legislature to increase benefits to everybody. So I just wanted to make sure to back up there. I have... Well, counsel, I knew that the legislative intent about benefiting the entire state was found in part of the statute, but for the bigger programs as well as the smaller programs. Yeah, I believe that. I believe Mr. Price testified, represented that these programs were just a minor or small part of the overall statute, and that's just categorically false. The statute, in fact, this is a major, major part of the act. The law explicitly requires at least 50% of the RECs to come from distributed generation programs and the community-reliable generation project. That's explicit. So this is at least half are coming from these programs. So it's pretty fundamental to the entire way that this act works. And I think another point that came up in the discussion is, you know, to the extent that this language is ambiguous, and I think it highlights with such a complex statute and such a long background that this is exactly why we want to have expert agencies involved in implementation. The ICC and the IPA. And that courts. And that courts. Parsing these words, making these distinctions. There's a reason for all how these words are constructed. Very complicated procurement. At best, you know, when you compare some of the straightforward language throughout the state, all citizens in the state, definitions, and then you take ComEd's argument that sort of requires a Venn diagram to fully understand, I think at best, at best ComEd has established that there's some ambiguity in this language, or these words could be interpreted in different ways. And if that's the case, the case law is very clear that the court owes deference to the commission's interpretation. And I think the argument also begs important questions. If the legislature had intended to exclude meetings and co-ops, why didn't it speak more clearly? Why wouldn't it have included them in the definitions? Why didn't it? And doesn't that go contrary to what the intent of this legislation is, to include everything? Yes. If you interpret the word utility to exclude these very significant parts of the state, that would go contrary to all the expressions of intent throughout the statute elsewhere. And I did also want to correct the record on sort of the significance of excluding little meetings and co-ops. I think in ComEd's brief, it suggests it wouldn't really matter that much because it's just a small part of the state. You know, and to the contrary, there's meetings and co-ops represent a significant amount of the state, both in terms of overall customers and service territory. There are 25 overall co-ops serving more than 300,000 customers in the state, mostly in the central and southern part of the state. There's 42 municipal utilities serving more than 270,000 customers located throughout the state, from Naperville to Springfield to Cairo. And to put that in perspective, these meetings and co-ops represent roughly half of the 1.2 million customers served by Ameren, more than six times the 85,000 Illinois customers served by MidAmerican. And excluding those just can't be squared with the manifest legislative intent to expand access to programs throughout the state to all citizens of the state. Thank you. Thank you, Mr. Kline. Mr. Price, rebuttal argument. Thank you, Your Honor. In my colleague's argument, I heard a lot of policy arguments and I heard a lot of arguments about general legislative intent, but I heard precious few arguments about the statutory text, which is what this Court is supposed to construe and ensure that the Illinois Congress Commission, for all its expertise, is regulating in a way that is consistent with what the General Assembly delegated to it to do. Don't they give deference to the Commission? You give deference only when there is an ambiguity. The Court's job is to the Commission is a creature of statute. The Commission has no powers other than the powers that the General Assembly gives to it. And it's this Court's job to police that and ensure that the Commission is doing what the legislature directed it to do. And so when the Court reads the statute and the statute uses the terms electric utility and utility, which my colleagues admit everywhere else in the statute means electric utility, the Court has to give effect to that choice of words. And it's not enough to say, oh, the statute's very long, it's a very complex subject matter, so we're just going to ignore what the words that the legislature actually use. The position in essence on that point is we don't get to any ambiguity. Terms are defined, it's clear, we don't get into statutory interpretation and expertise. Is that what you're saying? You certainly don't get to expertise and you don't get to legislative history or legislative purpose. And it's not just my opinion, it's the cases of this Court and the Illinois Supreme Court that say that. That the best guide of what the legislature meant is what it wrote in the statute, what the plain text says. And so, yes, that's why our argument is grounded in the plain text. And it's not Alice in Wonderland where you can import whatever meaning you want to to words that the legislature wrote. The statute, you know, gives the IPA the authority to tell you guys how many of these credits you have to buy, right? No, the IPA, the statute dictates how many credits we need to buy and the IPA conducts the procurement for the utility. And so the statute says ComEd has to apply, has to buy so many of these credits. That's right. Now, if there were not enough generation devices producing this amount of credits within ComEd's service area, you'd still have to buy the same amount of credits, would you not? We would. And so would it come from Ameren's service area or from Mideon's service area? It could, although the IPA procurement methodology is designed to ensure that there is a balance between the different service territories. It's thought about that problem and seeks a balance in the way that it procures RECs. So, I mean, theoretically, you are purchasing RECs that are generated in a different service area. That could be possible, yes. So then if your customers have to buy RECs that are generated in Ameren, what's the difference if they're generated in Ameren or Naperville? Well, again, the IPA is designing the procurement to try to prevent that problem and ensure that RECs really are spread across all the electric utility service territories. But, again, the answer is what the statute says and what the General Assembly wanted this program to do and whether the General Assembly anticipated that projects located in areas that are completely outside the entire regulatory scheme nonetheless get to benefit from the subsidies that electric utility customers are paying. And the answer to that is no. They're outside the regulatory scheme, these territories. And so projects located within them don't get to benefit from the subsidies that electric utility customers are paying. Does it bring down, theoretically, bring down prices for all consumers? If these projects flourish everywhere? I couldn't speculate on the answer of what the market effects would be of these projects because different utilities procure their power in different ways. But, again, I would really urge the Court to focus on the language of the statute, the Adjustable Block Program, subparagraph L. It says the REC price shall be paid in full by the contracting utilities. We know that's the electric utilities because they're the only ones that contract. At the time the facility producing RECs is interconnected at the distribution system level of the utility energized, the electric utilities shall receive and retire all RECs generated by the project. Their argument depends upon you have contracting utilities, which are definitely electric utilities, and you have electric utilities, which certainly are, and their argument depends on bringing utility here to mean something other than those, even though, again, everywhere else in the statute, in the same subsection, utility means electric utility. When I read that, and then when you just read that to me, it almost seems like it has to be interconnected, as I talked about a few seconds ago, to like if ComEd is getting by at the purchasing agency, then it has to be interconnected at a ComEd, in ComEd service areas. Well, I don't think so. That's why it says contracting utilities, so that each of the four, each of the three utilities enters contracts with the generator, and then it's interconnected with one of those utilities networks. That's the way the statute is set up to work. And, you know, with respect to the community renewable generation program, you have a section that talks about subscribers. The whole idea of this is a community garden where you sort of subscribe to the community solar farm, and subscriber is a defined term that says someone who takes service from an electric utility. Just respectfully, we think the text is clear, and this Court should apply the plain words of the text and not defer to an interpretation which is going to place the contrary to it. Thank you. The Court would thank the attorneys for their illuminating arguments here today, and thank you for the quality of your briefing on this issue. It's a complex statute, so we appreciate it. This will be taken under advisement.